UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                      CASE NO. 8:20-cr-275-T-36SPF

HAROL ANTONIO URTECHO MENDEZ,

    Defendant.

_____/

## DEFENDANT HAROL ANTONIO URTECHO MENDEZ'S SENTENCING MEMORANDUM

Comes Now, the Defendant, HAROL ANTONIO URTECHO MENDEZ, by and through undersigned counsel, and hereby files this Sentencing Memorandum in advance of the sentencing proceeding scheduled for May 21, 2021.  Mr. Urtecho entered a plea of guilty to Counts One and Two of the Indictment charging him with conspiracy to possess with intent to distribute and aiding and abetting the possession with intent to distribute five kilograms or more of marijuana while on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), 70506 (a) and (b) and 21 U.S.C. § 960(b)(1)(G).  (doc. 82).  For the reasons set forth below, Mr. Urtecho prays the Court show leniency and sentence him to 41 months imprisonment.[1]

---

[1] This sentence represents the low end of an offense level 22 which would be the Defendant's offense level if the Court granted the Defendant's requests to exclude the cocaine from the drug calculation, for a minor role departure, and a one level variance.  If the Court includes the cocaine and does not grant a minor role departure, the Defendant requests a corresponding variance based on the mitigating reasons set forth in this memorandum.

## I.     BACKGROUND

Mr. Urtecho is from Golfito, Costa Rica, a coastal town in the southwest part of the country, where he has lived his entire life.  Mr. Urtecho never knew his father and, along with his two brothers, was raised by his mother.  His mother struggled to provide financially and to keep up with three boys.  His family suffered a significant loss when his older brother passed away from cancer about fifteen years ago.  The loss also intensified the financial burden on the family as Mr. Urtecho's brother helped his mother make ends meet.  Understanding the toll that single parenthood was taking on his mother, Mr. Urtecho left school in the seventh grade to help provide for the family.

Without much of an education, Mr. Urtecho spent his life working on sport fishing boats.  Tourism from fishing and other recreational activities is a critical part of Golfito's economy.  In the fishing offseason, Mr. Urtecho worked with his brother at a duty-free shop.  Mr. Urtecho was able to make ends meet and help support his mother until the COVID-19 pandemic completely shut down the tourism industry in Golfito.  Not only did Mr. Urtecho lose his job, there were no other jobs to be had. The loss of tourism affected every business in Golfito.  He has very little education and his entire employment history was working fishing boats for tourists so finding other work, to the extent there was any available, proved impossible.

Mr. Urtecho lived a humble life, making about $400 a month.  He had no savings, and his extended unemployment left him in a dire situation.  Mr. Urtecho lived with his mother, who at that time was in her early seventies and not in good health so she was not employed.  Mr. Urtecho was helping his mother pay the

mortgage on her home so when he lost his job they were unable to make payments on the loan and faced foreclosure.  And, Mr. Urtecho's brother was not able to help.  He labored with severe diabetes, and his leg was amputated during that time.  If his health situation was not enough, he worked as a salesperson at a duty-free shop, so his job was also wrecked by the pandemic.

It was not just Mr. Urtecho and his mother who relied on his support.  Without income, Mr. Urtecho could not pay his monthly child support obligation.  Not only did Mr. Urtecho not want his child to go hungry, in Costa Rica imprisonment is a penalty for unpaid child support.  Mr. Urtecho's aunt loaned him money to make the minimum payment required to avoid jail until he could figure out a way to generate income again. Faced with his elderly mother on the brink of losing her home and the prospect of prison for unpaid child support, Mr. Urtecho was willing to do just about anything to earn money which made him the perfect candidate for recruitment for a drug smuggling venture.

When Mr. Urtecho was recruited to be a mariner on the go-fast vessel, he was told that the cargo would be marijuana.  Although not something he would agree to under normal circumstances, the idea that he would be transporting marijuana was more palatable since marijuana is gaining acceptance around the world.  Now, months later, Mr. Urtecho stands before the Court to accept his punishment.  When the pandemic upended Mr. Urtecho's life, he thought to himself that his situation could not get any worse.  He was sadly wrong.

## II.     18 U.S.C. § 3553(a) FACTORS

### 1.     *The Nature and Circumstances of the Offense, Section 3553(a)(1)*

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (citing *Koon v. United States*, 518 U.S. 81, 113, 116 (1996)).  At the time Mr. Urtecho agreed to take the trip, he did not fully appreciate the seriousness of his offense in comparison to the seriousness of his family's dire situation.  His primary concerns were keeping his mother in her home, helping his brother, supporting his child, and avoiding jail for unpaid child support.  From Mr. Urtecho's perspective, with no employment prospects, he thought he had no other choice.  That type of rationalization is easier to accept in one's mind at a time of desperation.  Poverty destroys people every day through confrontations with the law, disease, pollution, violence, and despair.  His decision was neither wise nor commendable, but the judgments of desperate people are often regrettable.  Under Section 3553(a) a sentencing court may properly consider a defendant's motive in mitigation of the sentence. *United States v. Ranum*, 2005 WL 161223, *5 (E.D.Wis. 2005) (citing *Wisconsin v. Mitchell,* 508 U.S. 476, 485 (1993)).

Although, Mr. Urtecho's offense is serious, it is important to note that he is charged with an offense involving marijuana, the acceptance of which has become much more widespread.  Congress has introduced a bill to legalize marijuana at the

federal level in H.R.1588 - Ending Federal Marijuana Prohibition Act of 2019. Seventeen states, Washington D.C., and Guam have legalized marijuana for recreational use. *See* Claire Hansen and Horus Alas, *Where Is Marijuana Legal? A Guide to Marijuana Legalization*, U.S. News and World Report (April 9, 2021). According to the National Conference of State Legislatures, only three states have no public access cannabis program. *See* https://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx. Part of the reason Mr. Urtecho agreed to take the voyage is because he rationalized marijuana as a lesser evil, and based on the actions of law makers in the United States, it is.

Although cocaine was later found hidden inside the marijuana, Mr. Urtecho had no idea it was there, and it was never part of what Mr. Urtecho agreed to transport. Mr. Urtecho did not pack the drugs nor did he view what was inside the sealed bales.

2.   *The History and Characteristics of the Defendant, Section 3553(a)(1)*

As the Supreme Court recently reiterated, "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (citations omitted). Mr. Urtecho has not had an easy life. From the time when most children are in middle school, he labored as a fisherman to help feed his family. He never had the opportunity for education or a life better than a poor boat worker. Then, when he lost his job due to the pandemic and his family's problems mounted, he reached a breaking point. He is the type of person that would do anything for his family, and he took the only job that offered to alleviate his financial distress; one that will cost him way more than he ever hoped to earn.

But, to his credit, he took responsibility for his offense and cooperated with the Government. He was not the first on his boat to proffer so he will not likely receive a 5K1.1 motion, but the Court can nonetheless recognize his cooperation, and the personal risk he undertook by doing so, through a variance. His willingness to help a foreign law enforcement agency is more indicative of his personal character than the offense he committed. Cooperation is a relevant factor in weighing the nature and circumstances of the offense and the history and characteristics of the defendant to arrive at a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *United States v. Huerta,* 878 F.2d 89, 93 (2d Cir. 1989) (citing 18 U.S.C. § 3553).

3.  *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Section 3553(a)(2)(A)*

"[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007). "There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist." *United States v. Stern*, 590 F.Supp.2d 945, 957 (N.D. Ohio 2008).

Although Mr. Urtecho has little knowledge of the United States legal system nor any allegiance to this country, he has always been respectful of the process and has

been a model inmate.  He has not displayed any characteristics evincing a threat to the public outside of his conduct in this case or shown that he is beyond rehabilitation. *See, e.g., United States v. Sayad*, 589 F.3d 1110, 1118-1119 (10th Cir. 2009) (finding downward variance reasonable where defendant was "good candidate for rehabilitation" based on defendant's recognition of seriousness of offense, strong family support, letters from the community, and lack of drug or sociopathic problems).

Mr. Urtecho gave the government the only thing he had to offer to compensate for his offense: his cooperation.  While his limited role in this offense does not leave him with as much information as some others may possess, his cooperation will hopefully help law enforcement further erode drug trafficking and make up for his participation in a drug offense.  However, the fact that that he has less information to provide than others because he was such a minor figure in the conspiracy does not mean he should receive a more severe sentence than those with better information. "Such an argument might have some merit if both defendants had equal information to provide to the government and one simply refused to produce it."  *United States v. Zavala*, 300 Fed.Appx. 792, 795 (11th Cir. 2008)(unpublished opinion).  "That is not the case" where the defendant "had no information to trade for a lesser sentence."  *Id*. No matter the usefulness of his information, he has taken substantial ameliorative actions including cooperation for which he bears the threat of violent retaliation.

A just punishment in this situation must take into account that Mr. Urtecho has also been punished in ways other than the traditional prison sentence. He will be incarcerated in a foreign country where he knows no one.  He has no money to make

phone calls or to afford basic commissary items.  He must rely on fellow inmates who are willing to share money for a phone call or some toiletries with him. His family will likely never visit him during his incarceration because they lack the means to travel to the United States.  He has essentially been cut off from his family and friends.  And, when he is eventually released, he has no assurances that his family will be waiting for him.  All of these circumstances increase the severity of his incarceration and are important considerations in determining the "just punishment for the offense."  *See e.g., United States v. Smith*, 27 F.3d 649, 655-656 (D.C. Cir. 1994)(a downward departure may be appropriate where a defendant's status causes a fortuitous increase in the severity of his sentence.).

Although he wanted to help his family, Mr. Urtecho is aggrieved by knowing his transgression put his family in a worse position than before his offense.  Now, they have even lost the meager support he provided.  The Bureau of Prisons will provide Mr. Urtecho with shelter, a bed, and food.  Unfortunately, Mr. Urtecho's family will bear the burden of his incarceration as they slip deeper into poverty.  The punishment Mr. Urtecho will bear is greater than simply being confined to a cell.  He will miss his child growing up and may never see his mother again due to her poor health.  The life he knew before his imprisonment will not be there when he is released.  Although the sentence he is requesting is less than the Presentence Report's current Sentencing Guidelines recommendation, it is no less just.

4. *The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct, Section 3553(a)(2)(B) and the Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant, Section 3553(a)(2)(C)*

While it is impossible to divine at what threshold a particular sentence will have a deterrent effect on Mr. Urtecho and the community at large, a sentence of 41 months is a significant consequence.  Certainty of punishment is a much better deterrent than severity. *See* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010)([I]in virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity).

While the Government's interest in discouraging people like Mr. Urtecho from participating in narcotics transportation is strong, that factor alone should not justify a lengthier sentence.  "It is true that almost any factor, considered in isolation, may be made to appear positive or negative, when employed by a talented rhetorician. But that is ignoring the context, the totality of the circumstances…the individual case and the individual defendant before it. "*United States v. Roberson*, 573 F.Supp.2d 1040, 1050 (N.D.Ill. 2008)); *cf. also United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008)("[T]he Government's argument based on deterrence alone is flawed because it elevates one § 3553(a) factor—deterrence—above all others.").  "Individual criminal sentences are not the proper forum for an expansive dialogue about the principles of criminal justice. Such conversation, though vital, should not take place here—lives are altered each and every time a district court issues a sentence: this is not a theoretical exercise." *Stern*, 590 F.Supp.2d at 961.

Incarcerating Mr. Urtecho for longer than 41 months will not stop the drug smugglers from continuing their operations.  He is expendable to the people who plan these trips.  Sadly, there are many desperate people like Mr. Urtecho who are recruited every day to fill his role.

At some point, the cost on U.S. taxpayers to incarcerate Mr. Urtecho outweighs the necessity of a greater punishment.   Lengthy imprisonment without some offender specific reason not only burdens government budgets, but also fails to enhance public safety.  VALERIE WRIGHT, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT, November 2010, at 9. The longer Urtecho's sentence, the more life will pass him by, he will become institutionalized, and his transition back to society will be more difficult.  *See, e.g.,* Thomas Orsagh and Jong-Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, JOURNAL OF QUANTITATIVE CRIMINOLOGY, 4(2):155-171, 1988.

Mr. Urtecho committed this offense because he is poor and additional prison time will not solve that problem.  Educational and vocational support will go much further in keeping Mr. Urtecho from reoffending.

5.   *The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner, Section 3553(a)(2)(D)*

While Mr. Urtecho would greatly benefit from educational and work opportunities, such rehabilitation can be accomplished in 41 months.  Mr. Urtecho finds himself in this situation because he did not have the education or skills to find work once he lost his job.  Learning English, finishing high school, and adding job

skills such as mechanics or electrical would help Mr. Urtecho support his family and keep him from turning to crime for employment. Although prison may offer Mr. Urtecho opportunities to improve himself, a sentence longer than 41 months is not necessary to achieve that. A longer sentence will only deteriorate his ability to transition back to society.

### III.   THE SENTENCING GUIDELINES, SECTION 3553(a)(4)

#### A. *The Weight of Cocaine Concealed in the Marijuana Should not be Counted.*

The 17 kg of cocaine should not be counted in the base offense level computation because the three criteria of USSG §1B1.3(a)(1)(B) are not satisfied. As indicated in the PSR, the cocaine was concealed within the bales of marijuana and was only discovered after the bales were searched. The cocaine would only have been apparent to the individuals who packed the bales. Mr. Urtecho had no role in packing the marijuana or loading it on the boat. Mr. Urtecho had no knowledge of the cocaine and it was not part of the conspiracy to which he agreed.

Typically, a defendant's lack of knowledge about the type or quantity of drugs he transported does not preclude the Court from holding him accountable for the unknown drug at sentencing. *United States v. Alvarez–Coria*, 447 F.3d 1340, 1344 (11th Cir.2006); *see also* U.S.S.G. § 1B1.3 comment. (n. 2(a)(1)). However, for Mr. Urtecho to be responsible for the cocaine, the three criteria of USSG §1B1.3(a)(1)(B) must nonetheless be satisfied and the additional cocaine must be part of the criminal conspiracy to which Mr. Urtecho agreed.

According to USSG §1B1.3(a)(1)(B), in the case of a jointly undertaken criminal activity, all acts and omissions of others can be included if they were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity. As to the scope of the jointly undertaken criminal activity, the transportation of cocaine was never part of the conspiratorial agreement in this case.  Without knowledge of the presence of drugs, a defendant cannot have the specific intent required for the conspiracy. *United States v. Walden*, 175 F. App'x 308, 318 (11th Cir. 2006); *see also United States v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002) (a defendant need not know every detail of the conspiracy, but the government must prove that he knew the essential nature of the conspiracy).   In fact, the cocaine was specifically concealed from the crew members on the boat.  This is not a case where the drugs were contained within a suitcase or backpack where a defendant would only need to open the case to determine what was inside.  It is also not a circumstance where Mr. Urtecho agreed to transport without any regard for the type of narcotic.  Mr. Urtecho was convinced to join the conspiracy because it only involved marijuana and not more serious drugs.

As Application Note 3(B) to Section 1B1.13 states, the defendant's accountability for the conduct of others must be determined from the scope of the criminal activity *the particular defendant agreed to jointly undertake* (i.e., the scope of the specific conduct and objectives *embraced by the defendant's agreement*). (emphasis added). In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. *Id*.  There is no evidence that

Mr. Utecho agreed to jointly undertake transporting cocaine or that cocaine was part of the "specific conduct and objectives embraced" by Mr. Urtecho.  The evidence is to the contrary in that others took steps to hide the cocaine from him.   Accordingly, the accountability of Mr. Urtecho for the acts of others is limited by the scope of his agreement to transport marijuana. *Id*.  Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).  *Id*.

"A defendant who is unaware that he is in the process of possessing the drugs that are the object of the conspiracy is not, by any stretch of the imagination, aware of the essential nature of the conspiracy."  *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017); *United States v. Ohayon*, 483 F.3d 1281 (11th Cir. 2007).  "[O]ne does not become a party to a conspiracy by aiding and abetting it, unless he knows of the conspiracy…"  *Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943).  And, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy."  *United States v. Getto*, 729 F.3d 221, 234 n. 11 (2d Cir. 2013).  Because Mr. Urtecho did not conspire to possess the cocaine, he should not be held accountable for it under the sentencing guidelines.

As to the issue of whether the possession of the cocaine was in furtherance of the criminal activity, the presence of the cocaine had no bearing on, and did not further, the conspiracy to distribute marijuana to which Mr. Urtecho agreed.

Certainly, someone had an interest in transporting that cocaine and it furthered their goal, but that was not the goal of the conspiracy to which Mr. Urtecho agreed.

Lastly, it was not "reasonably foreseeable" to Mr. Urtecho that other drugs may be hidden within the marijuana. He was specifically told that he would be transporting marijuana and there is no evidence that he had any reason to know that cocaine would be concealed within the marijuana. Mr. Urtecho's role in this conspiracy did not afford him access to any of the planning for this voyage. He had no knowledge of the structure or organization of the individuals who arranged the trip, outfitted the boat, and planned to distribute the marijuana such that he could foresee that they also planned to include cocaine in the vessel.

### B. *Minor Role*

Mr. Urtecho requests the Court impose a downward adjustment for minor role pursuant to USSG § 3B1.2. As the Eleventh Circuit held in *United States v. Cruickshank*, 837 F.3d 1182 (11th Cir. 2016), a defendant in Mr. Urtecho's position is eligible for a role adjustment. The recent clarification to USSG § 3B1.2 provides that "[f]or example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." U.S.S.G. Supp. App. C, Amend. 794. And, as Application Note 3(A) to USSG § 3B1.2 states: "For example, a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored, may receive an adjustment under this

guideline." Those examples encapsulate Mr. Urtecho's role in this offense. With that backdrop, the *De Varon* factors and the considerations outlined in the commentary to USSG §3B1.2 weigh in favor of a minor role reduction.

### i. Measuring the Defendant's Role Against His Relevant Conduct

The first prong of the *De Varon* analysis asks the Court to evaluate Mr. Urtecho's role against his relevant conduct. *United States v. De Varon*, 175 F.3d 930, 934 (11th Cir. 1999). The Government will argue that Mr. Urtecho's role should not be evaluated as part of larger conspiracy because he is only responsible for the weight of drugs on his boat. Yet, limiting the analysis to the drugs on the boat does not mean that everything else regarding those specific drugs is irrelevant. The plan for those drugs did not originate with Mr. Urtecho nor was their distribution to be accomplished through Mr. Urtecho. Somebody organized a plan to take marijuana from Colombia to be distributed someplace else. Mr. Urtecho was a link in the distribution chain for those specific drugs, but there were many links that must be considered.

The Government often asserts in these cases that the object of the conspiracy to which Mr. Urtecho pleaded guilty was to transport drugs across international waters. However, that is an overly limited description of the object of the conspiracy which is inconsistent with his charge and plea. According to the personalization of elements and factual basis to Mr. Urtecho's plea, "the object of the unlawful plan was to possess *with intent to distribute* one thousand kilograms or more of …of marijuana." (doc. 73, pg. 2)(emphasis added). Importantly, neither the Indictment,

the elements to which Mr. Urtecho pleaded, nor the factual basis charges a conspiracy that is limited to transportation. Mr. Urtecho's role may have been transportation, but that does not represent the scope of the offense charged.

In the same way that the Government argues that a defendant cannot narrow their relevant conduct for purposes of guilt and then expand the conspiracy for purposes of sentencing, the Government cannot convict a defendant for a conspiracy to distribute and then argue at sentencing that their conspiracy was limited to transportation. *See De Varon*, 175 F.3d at 941. After all, the government must connect a defendant with both aspects of the crime, possession *and* intent to distribute. *United States v. Burroughs*, 830 F.2d 1574, 1581 (11th Cir. 1987).

Possession of marijuana "with intent to transport" is not a violation of the statute. Boating drugs through international waters with no intent other than to transport them does not rise to the level necessary to give the United States jurisdiction over the offense and ultimately for a conviction. Although the Government claims that Mr. Urtecho is not being held accountable for the actions of any larger enterprise, his guilt depends on the actions of a larger enterprise. There is no evidence Mr. Urtecho had the plan or the means to distribute anything. The intent to distribute, which is a necessary element to convict him, is imputed to him because that was the intent of the larger enterprise. If his intent was limited to transporting drugs in international waters then that intent is different than what he was charged with and likely would not support his conviction.

16

In addition, if a conspiracy to transport were something the Government could rely on, then no defendant whose role is to transport could qualify for minor role. That theory would run contrary to Application Note 3(A) to USSG § 3B1.2 which specifically affirms, "a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored, may receive an adjustment under this guideline." Importantly, one of the factors *De Varon* identified as relevant to the minor role analysis in the drug courier context is "role in the distribution." *Palma-Meza*, 685 F. App'x 806, 809 (11th Cir. 2017) (citing *De Varon*, 175 F.3d at 945). Because distribution is the linchpin to the statute, a drug courier's conduct should be evaluated with regard to the distribution scheme.

*De Varon* was concerned with a defendant making a minor role claim based on a "far-flung narcotics conspiracy." *De Varon*, 175 F.3d at 947. Yet, that is not the case here. This go-fast vessel did not set out based solely on the efforts of the four crewmembers aboard. Nor were those crewmembers the last stop in the distribution chain for these drugs. We may not know the specific identities of the people who touched these drugs, but we know that there were people present when the go-fast departed and that there would be people ready to meet the go-fast on arrival.

The only sense in which Mr. Urtecho's actual conduct is coextensive with his relevant conduct is the weight of the drugs. However, weight is not really conduct nor are additional drugs necessary to consider all of the other people involved with

just this one boat trip.  Weight fails to take into account how Mr. Urtecho came to be on the go-fast, who recruited him, paid him, transported him to the go-fast, owned the drugs, packed the drugs, put the drugs on the go-fast, outfitted the go-fast, and would meet the go-fast to take the drugs to their next stop.  Mr. Urtecho's go-fast was not unlike other go-fasts in that the captain had a GPS and satellite phone.  Someone was on the other end of that phone, someone set the course on the GPS, and someone was going to meet them wherever that GPS took them.  When Mr. Urtecho stepped onto the go-fast, it was loaded and ready to go to its next stop.  It had cargo, a course, and a plan and Mr. Urtecho had nothing to do with any of that.  The weight of the drugs did not plan this trip.  People did, and those people are part of the offense conduct.

A unique consideration in this case is that Mr. Urtecho is being held responsible for 20 kg of cocaine of which he had no knowledge and was concealed within the marijuana bales by someone other than the four crew members.  Therefore, if relevant conduct principles hold Mr. Urtecho responsible for additional drug weight by the actions of the individuals who put that cocaine on the boat, then those individuals must be considered in determining minor role.  If they are not relevant to minor role then he cannot be held responsible for their actions.  Those individuals were clearly superior to Mr. Urtecho, and his role in comparison was minor.   The Government cannot now argue that the conspiracy should be viewed as broad for purposes of base offense level but narrow for minor role.

### ii.  Comparing the Defendant's Role to that of Other Participants.

The second prong of the *De Varon* analysis asks the Court to measure the
defendant's conduct against that of other participants in the criminal scheme
attributed to the defendant.  *De Varon*, 175 F.3d at 934.  As an initial matter, Count
One of the Indictment alleges that Mr. Urtecho and his crewmembers "did
knowingly, willfully, and intentionally combine, conspire, and agree with each other
*and other persons unknown to the Grand Jury…*" (doc. 12, emphasis added).  While
those other persons are not identified, it was contemplated by the Grand Jury that
other people were part of this criminal scheme beyond just the crewmembers, and
the evidence bears that out.

Also, for Mr. Urtecho to qualify for safety valve, he must disclose "all
information and evidence the defendant has concerning the offense or offenses that
were part of the same course of conduct or of a common scheme or plan…"  18
U.S.C. § 3553(f)(5).  The Government's position is that a defendant in this situation
must disclose his recruiter and any others he can identify to qualify for safety valve.
If, as the Government asserts, the only relevant participants in his offense were the
crewmembers then he should not be required to identify any non-crewmembers to
qualify for safety valve.  However, if his safety valve obligation extends to others
because those others are part of the "same course of conduct or of a common scheme
or plan" then they should be considered in the minor role determination.  Under that
analysis, he is less culpable than his recruiter and all of the other individuals who

recruited his crew members, planned the trip, were present at the launch site, were going to take possession of the drugs from his vessel, and so on.

Although Mr. Urtecho carries the burden to prove his role, it is difficult to place the burden on someone who, because of their lesser role in the offense, does not know the people responsible for this venture or the dozens or more people involved in moving these drugs from Colombia to their ultimate destination for distribution.  But, we know the offense encompasses more than just the crewmembers.  This trip does not happen without many people planning, coordinating, and paying for this venture.  Just because Mr. Urtecho cannot specifically identify them, does not mean they were not present.  In relation to them, Mr. Urtecho's role was minor.

### iii.  Other Factors to Consider

In addition to the two-prong analysis discussed above, *De Varon* offers a non-exhaustive list of other considerations.  In the drug courier context, examples of some relevant factual considerations include: amount of drugs, fair market value of drugs, amount of money to be paid to the courier, equity interest in the drugs, role in planning the criminal scheme, and role in the distribution.  *Palma-Meza*, 685 F. App'x at 809 (citing *De Varon*, 175 F.3d at 945).  In addition, Application Note 3(C) of § 3B1.2 offers a similar list of factors that bear on the totality of circumstances.

Mr. Urtecho's participation in the offense satisfies nearly all of the non-exhaustive list of factors found in Application Note 3(C) of § 3B1.2 and *DeVaron*. Mr. Urtecho had little understanding of the scope and structure of the criminal

activity.  He only knew enough to allow him to perform the specific tasks he was directed to perform.  He did not recruit anyone to join the activity and was himself recruited by someone else.  He was not responsible for obtaining the drugs, nor was he aware of where they came from, who owned them, the amount, or their ultimate destination.  To this day he would not know the quantity of drugs without reviewing the discovery.  He did not obtain the boat, choose the course, or prepare the boat for the journey.  He was not involved in planning or organizing even the most basic activities.  He had no decision-making authority or influence over any other person.  In fact, if he had deviated in any way from the instructions given to him, he likely would have been harmed.  In his role, he had no discretion over how the drugs were to be transported, the route, the individuals he would work with, or any other details associated with moving something from one location to another.  He was to be paid an agreed upon wage for being a mariner on the boat and had no proprietary interest in the purchase or sale of any of the drugs.

The only factor that weighs against Mr. Urtecho is the weight of the drugs.  Like *Cruickshank*, while the amount of drugs in this case is substantial, "there is nothing in the record to suggest that the amount of drugs was indicative of the magnitude of [the defendant's] participation in the crime -- to the contrary, he did not load the drugs on the vessel, reconstruct the vessel, fuel the vessel, attend the planning meetings for the trip, or otherwise appear to have any role concerning the quantity of drugs."  *Cruickshank*, 837 F.3d at 1195 n. 1.  The quantity of drugs was not something over which Mr. Urtecho had any control and does not distinguish this

21

case from *Cruickshank*.  If anything, the weight demonstrates that Mr. Urtecho was working for the original source of the drugs or someone close to them, and Mr. Urtecho's role was minor in comparison to such people.

The street value of the drugs in the United States is also a poor indicator of Mr. Urtecho's role.  A more appropriate value in this case is the cost of production of those drugs to the people who planned these ventures, a number substantially less than street value.  Marijuana is a renewable resource, and a lost shipment is replaceable by the next crop.  Mr. Urtecho's vessel, like most go-fast boats, was just a basic fiberglass or aluminum hull with engines.  Beyond the engines, the boat has little value and offers little protection to its operators.  It is certainly not the type of transportation to which one would normally entrust valuable cargo.   The cartels are undoubtedly aware that many of these go-fast vessels are captured and some may never reach their destination due to weather, engine trouble, piracy or some other circumstance.   Crewmembers like Mr. Urtecho are expendable to the people who organize these voyages.  And, because the Guideline calculation depends almost entirely on the weight of drugs in a case like this, couriers at the bottom of the conspiracy are punished more severely for the decisions of people with whom they had no contact.

Lastly, even if Mr. Urtecho's role could be considered important to the success of the venture, such a factor is not determinative.  *See* U.S.S.G. Supp. App. C, Amend. 794.  Nearly every job associated with a criminal enterprise, or even a legitimate enterprise, could be considered important to some aspect of the enterprise,

otherwise the job would not exist.  Someone above Mr. Urtecho organized and funded this voyage and recruited the people to fill the multiple jobs required to accomplish the voyage.  Granted, Mr. Urtecho kept the boat moving, but his absence from this crime would not have prevented it from occurring.

## IV.   REQUEST FOR VARIANCE

If the Court does not find in favor of any of Mr. Urtecho's Guidelines objections, he asks the Court to consider his lesser role, his lack of knowledge of the concealed cocaine, and his other mitigating factors and grant him a variance.  "[A]fter *Booker,* a district judge can fairly consider policy statements concerning departures and fairly decide to impose a non-Guidelines sentence without definitively resolving close questions regarding the precise meaning or application of a departure policy statement."  *United States v. Canova*, 412 F.3d 331, 358 n. 28 (2d Cir. 2005).

As the Court is free to sentence Mr. Urtecho without regard to whether he meets the technical requirements of the Guidelines, due to his significant mitigating circumstances, he requests a sentence of 41 months, the low end of an offense level 22 on the sentencing table.  Following *Gall v. United States,* there is no requirement of "'extraordinary' circumstances to justify a sentence outside the Guidelines range." 552 U.S. 38, 47 (2007).  Subject to review for reasonableness, district judges are now free to apply their own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the guidelines. *United States v. Rodriguez*, 406 F.3d 1261, 1289 (11th Cir. 2005) (Tjoflat, J., dissenting) (citing *Booker*, 125 S.Ct. at 790 (Scalia, J., dissenting)).

Mr. Urtecho is poor.  By U.S. standards, he would be amongst the poorest people in the country.  He made a bad decision in the face of desperate financial circumstances.  He deserves to be punished, but he also deserves a measure of mercy.

In order for the drugs on Mr. Urtecho's vessel to reach the United States, there were dozens of people involved in that process.  If all of those people were now standing before the Court, Mr. Urtecho would be amongst the least culpable, if not the least culpable.  He is simply the one who has been caught.

To date, life has not been particularly lenient to Mr. Urtecho.  He asks the Court to show leniency to him and sentence him to 41 months imprisonment.  If a person's "immediate misconduct" should ever be "assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006). Such a sentence is sufficient, but not greater than necessary, to satisfy the 18 U.S.C. § 3553(a) criteria and to accomplish the goals of sentencing.

Respectfully submitted,

By: /s/ *P. Matthew Luka*
P. MATTHEW LUKA
Florida Bar No.  0555630
TROMBLEY & HANES. P.A.
707 North Franklin Street
10th Floor
Tampa, Florida  33602
Telephone: (813) 229-7918
Facsimile:  (813) 223-5204
mluka@trombleyhaneslaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *P. Matthew Luka*
P. MATTHEW LUKA
